## TEXAS & N. O. RY. CO. v. MARTIN et al.
### No. 1996.

Court of Civil Appeals of Texas. Beaumont.
Nov. 4, 1930.

Rehearing Denied Nov. 12, 1930.

Arterbury & Coolidge, of Houston, for appellant.

Jno. S. Redditt and J. J. Collins, both of Lufkin, for appellees.

O'QUINN, J.

This action was brought by Mrs. J. E. Martin, joined by her husband, J. E. Martin, to recover of the railroad company damages for an illegal arrest and detention of herself, alleged to have been made by an officer of the city of Lufkin, at the request, instigation, and procurement of F. H. Hall, a conductor on one of appellant's passenger trains. She prayed for actual and exemplary damages.

The defendant answered by general demurrer, special exceptions, general denial, and a special answer.

The case was submitted to the jury upon special issues, and upon their answers to same, judgment was rendered for plaintiffs for $2,000 actual damages and $500 exemplary damages. Motion for a new trial was overruled, and the case is before us on appeal.

The evidence showed that the arrest was made by one C. C. Matthews, a policeman of the city of Lufkin, without any affidavit or warrant, and fails to show that Mrs. Martin had committed any offense. Mrs. Martin adduced testimony to the effect that when the train on which she was a passenger arrived at Lufkin that Hall, the conductor, voluntarily pointed her out to the officer who made the arrest, requested him to arrest her, and said not to let her get away. This was sharp-

ly disputed by the testimony of Hall for the defense.

Mrs. Martin bought a ticket at Houston for transportation on appellant's night passenger train to Lufkin, boarded the train, and surrendered her ticket to F. H. Hall, the conductor. There is no hint that she behaved unbecomingly or did anything that would warrant her being arrested or detained. At Cleveland, a station on appellant's railway line between Houston and Lufkin, a man got on the train in the car in which Mrs. Martin was riding, and as the train was leaving Cleveland the man took a running dive and jumped through a window of the car, smashing the glass and disappearing. Hall, the conductor, interrogated various passengers relative to the man. Mrs. Martin testified, in substance, that he asked her her name, and that when she told him she was Mrs. J. E. Martin and lived in San Antonio, he asked her if she knew the man that had jumped through the window, and she told him that she did not; that she had never seen him before. That Hall repeatedly asked her whether she knew the man and was she sure that she did not know him, and she repeatedly told him that she did not know the man and had never seen him before. That Hall walked up and down in the car looking toward her and telling the other passengers in the car that she did know something about the man that jumped out of the window. She said that Hall would walk to the front of the car and then turn and come back to her and ask her again about the man and whether she knew any one at Lufkin. That Hall finally asked her if she knew Johnny Martin, a man who a day or two before was said to have robbed a bank at Texas City, and that she told him she did not. Hall then asked her if Johnny Martin was any relation of hers, and whether Johnny Martin was her husband. That she told him that she did not know Johnny Martin and that she lived in San Antonio where she worked. That Hall then asked her, "Are you sure that you don't know Johnny Martin, who robbed that bank, that robbed the Texas City Bank?" and that she told him she didn't know Johnny Martin. She testified: "As to what he said to me about my being the wife of Johnny Martin, who robbed the bank, I will state that he asked me if I wasn't. He talked to me about Johnny Martin and claimed I was probably going to meet him in Lufkin. He asked me if I wasn't going to meet him; he said 'didn't you have an appointment to meet Johnny Martin here' and I told him no, I didn't know him; and he says 'are you sure you do not know him; they have never got Johnny Martin, who robbed the bank, and they are looking for him and are going to arrest him when they see him— they will find him and arrest him.'" And that Hall kept asking her embarrassing ques-

tions. She said: "He asked me if I wasn't related to Johnny Martin and didn't have anything to do with robbing the bank. I told him no sir, I didn't know this man, and didn't know that he had robbed a bank; all I knew was I read it in the heading of the morning paper. I never saw Johnny Martin, and never heard of him in my life." She further testified that Hall told her that he believed that she was connected with Johnny Martin, and that she was Mrs. Johnny Martin, and that she was going to Lufkin to meet Johnny Martin and to divide the spoils of the bank robbing. That Hall said to her: "When you get to Lufkin I am going to have you arrested and have you talk to the officials there." She said Hall watched her all the way to Lufkin. That when Hall told her he was going to have her arrested when she got to Lufkin, she asked him what had she done for which she should be arrested, and that he replied: "They will find out everything you have done when they get through." And that he further said, "If you haven't done anything, you know that man (meaning the man that jumped out of the car window) and they will find out what you know when you get to Lufkin," and "you saw Johnny Martin when he jumped out of the window," and that she replied: "I don't know the man; I never saw him before in my life." She further said that Hall told her that he was going to wire ahead for an officer to meet the train, and that it frightened her, worried her, and embarrassed her. She testified that when the train reached Lufkin Hall pointed her out to the officer and said: "There is the woman you want; that is Mrs. Martin; arrest her and she can tell you about the man who jumped out of the window or about Johnny Martin; this is Mrs. Martin; this is the woman you want; she can give you the information you want." She further testified that she heard Hall tell the officer to arrest her; that she was the wife of Johnny Martin, the wife of the man who robbed the Texas City bank and that he knew that Johnny Martin jumped out of the car window and escaped; and that the officer did then arrest her, carried her to a hotel for a time, and then placed her in jail, where she remained until the next day, when she was released, no manner of charges being preferred against her by anyone. As to her release from jail, she testified:

"I got out of jail the next day a little after noon. As to why they let me out, they told me that they found out it was a mistake and I was not guilty and I had not done nothing and did not know Johnny Martin and were sorry they caused me the embarrassment of putting me in jail; that I didn't have anything to do with it and had not known this man. When the conductor told the officers to arrest me, that I was the woman they wanted and connected me with the bank robbery

as to what I said to the conductor or the officers in the conductor's presence, as to whether or not I had done anything wrong I will say when he accused me of being Mrs. Johnny Martin and told the officers to arrest me, I said I was not Mrs. Johnny Martin, and did not know the man that had jumped off the train, and never saw him before, and the conductor said 'Yes she is Mrs. Johnny Martin; she got off the train here, and this man got on at Cleveland.' He commanded them to arrest me; and they arrested me immediately."

The record discloses that the man who jumped through the car window was a dope addict and a perfect stranger to Mrs. Martin.

The evidence further shows that Hall, the conductor, had the operator at Livingston to call the operator at Lufkin to have an officer to meet the train, and that in obedience to that message he called the sheriff's office at Lufkin and that there were four officers at the train. The Lufkin operator testified that he knew what the officers were there for, and that the person in question was a woman.

Hall testified admitting that he talked twice to appellee concerning the man who jumped out of the car window, but denied that he otherwise worried her. His object, he said, was to get all the information possible as to the man's jumping out of the car, as he must report the matter, together with all the information available to him, to his employers. He admitted sending the message from Livingston to Lufkin for an officer to meet the train, but said he did not request or instruct the officers to arrest Mrs. Martin but that he merely pointed her out to the officers, and told them that if they arrested her they would find out something about the man that jumped out of the car window, who he thought was Johnny Martin, the man said to have robbed the Texas City bank.

C. C. Matthews, the officer making the arrest, testified that at the time of the arrest he was on the night police force of the city of Lufkin. That appellant's telegraph operator at Lufkin told him that he (the operator) had a message from the conductor to have an officer at the train, but did not tell him what the trouble was. That he met the train at the request of the railroad company's agent and saw the conductor, whom he knew, Mr. Hall. That the conductor, Hall, got off of the train in advance of Mrs. Martin. He said:

"The conductor told me why he wanted me at the train that night, when he first walked up to me. I walked up to the train and spoke to him and he turned around and says—she was getting off of the steps at that time— and he says 'that is the woman, I want you to talk to; arrest her and you will find out something; she is connected in some way with the Texas City bank robbery'; and he said a man jumped off the train and he thought

he was Johnny Martin, and he says 'You had better get her before she gets away.' I then took him at his word. I arrested her because I thought he knew what he was talking about. It was at the request or on a statement made by the conductor; that is the reason."

He further testified:

"I made the arrest of Mrs. J. E. Martin that night at the conductor's request and procurement. That conductor was Mr. Hall. Mrs. Martin was later placed in jail."

The arrest was made immediately after Mrs. Martin got off the train and while she was on the railway premises.

Appellant presents its first and second propositions together. They are:

"Proposition No. 1. A defendant railway company cannot be liable for false imprisonment when the facts show that the defendant did not accuse plaintiff of any misconduct or of being guilty of any penal offense and that the only thing done by the defendant was to state to the police officers that if they arrested the plaintiff they might get some information in reference to another party whom the officers were looking for."

"Proposition No. 2. It cannot be said that a conductor of a defendant railway company directed and procured an arrest or that his acts were a direct and proximate cause of an arrest when his only act was to inform à police officer that the plaintiff possibly knew something of a certain party whom the police officer was looking for and that if he (the officer) arrested the plaintiff he might find out something about the other party he was looking for."

■ These propositions in effect challenge the sufficiency of the evidence to support the jury's finding that Mrs. Martin was arrested at the request, instigation, and procurement of appellant's agent, Conductor Hall. Under these propositions the contention is made that appellant is not liable for false imprisonment or arrest because the conductor did not tell the arresting officer that Mrs. Martin had violated any law, nor had he accused her of any misconduct, but had merely informed the officer that she, perhaps, knew something about the man that jumped through the car window, and that it was possible that said man was Johnny Martin, for whom the officers were looking. In urging this contention, appellant in its brief says:

"The conductor did not request her arrest and had no personal interest in the matter and the interest of his employer was in no way involved."

Matthews, the arresting officer, testified that he arrested Mrs. Martin at the request of the conductor, and also that the conductor told him that she was, in some way, connected with the Texas City bank robbery,

and that the man who jumped off of the train was, he thought, Johnny Martin, the man who had robbed the bank. Mrs. Martin also testified that the conductor told her that he was going to have her arrested when she got to Lufkin and that she heard the conductor tell the officer to arrest her. The jury found that the conductor did request the arrest of Mrs. Martin and that she was falsely arrested and imprisoned as the direct and proximate result of the direction and request of the said conductor to said officers. The conductor admits sending a message to appellant's agent at Lufkin to have an officer meet the train. The officer met the train, and the conductor voluntarily pointed out Mrs. Martin to the officer, and the officer says directed him to arrest her, and that because of the direction and request he did arrest her. The evidence abundantly supports the jury's finding. The assignments are overruled.

■ Appellant's third and fourth propositions are submitted together, and complain that the court erred in not defining in his charge the words "directing an arrest," and "procuring an arrest," in submitting issues involving these terms. These propositions are based upon appellant's assignments of error Nos. 2, 3, 4, 9, and 20. Assignment of error No. 2 complains that the court erred in not giving to the jury its special charge No. 2, which merely instructed the jury to answer special issues Nos. 3, 4, 5, 7, and 8, "No," if they believed from the evidence that "the conductor's only statement to the officers was in effect 'if you arrest this woman you may find out something from her about the man who jumped through the window; he might have been Johnny Martin.'" It is seen that this assignment in no manner complains of the charge of the court as to not defining anything. It cannot be made the basis for the proposition. The third assignment asserts error in the court's failure to give its special charge No. A, which inquired of the jury whether the only statement the conductor made to policeman Matthews was: "If you arrest this woman you may find out something from her about the man who jumped through the window, he might have been Johnny Martin." This assignment does not at all relate to the failure of the court to define any terms and thus is not a basis for appellant's complaint. The fourth assignment claims error in the court's failure to give its special charge No. B, which reads:

"Do you find from a preponderance of the evidence that the only statement conductor Hall made to the officers on the occasion in question was in pointing out to them the plaintiff and in telling them that she could tell them something about the man who jumped through the window, and in describing to them the man who did jump through the window."

This assignment does not in the least complain of the court's refusing or failing to define any term used in his charge.

■ It affords no basis for the proposition urged. Assignment No. 9 asserts error in the court's failure to instruct the jury as to the legal meaning of the words "procure" and "proximately cause" in reference to the word "arrest," as used in special issue No. 3 of the court's charge. Special issue No. 3, as submitted by the court, reads:

"Do you find from a preponderance of the evidence that the defendant's conductor, F. H. Hall, intentionally and voluntarily procured and directed and proximately caused the arrest of the plaintiff when she reached defendant's station at Lufkin, Texas, on the date involved herein?"

Article 2189, R. S., in providing for the submission of cases upon special issues, declares "in submitting special issues the court shall submit such explanations and definitions of legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict on such issues." The statute has not attempted to state what legal terms shall be explained or defined further than "shall be necessary to enable the jury to properly pass upon and render a verdict on such issues." The test should be, considering the terms used, reasonable necessity. Ordinary words of simple meaning do not call for definition. It is only those that are technical and have a distinct, fixed legal meaning which a person of ordinary intelligence would not understand that fall within the rule or statute. We do not believe that the court's failure to define the words mentioned was error. They are words of everyday use and to persons of ordinary intelligence are easily understood. The court in his charge defined the terms "false imprisonment" and "proximate cause." We think this was a sufficient explanation and that it was not necessary to define "direct" or "procure."

Appellant's fifth, sixth, and tenth propositions read:

"Proposition No. 5. An issue submitted to the jury should not be framed as to be on the weight of the evidence."

"Proposition No. 6. It is error to submit issues of fact to the jury which are not raised by the evidence."

"Proposition No. 10. It is error to submit a charge to the jury that is upon the weight of the evidence and which is calculated to mislead and unduly influence the jury in its findings."

■ These propositions are but abstract propositions of law. They do not point out any specific error, and hence are not in compliance with the rules for briefing, and therefore should not be considered. However, if considered they show no reversible error and are overruled.

■ The seventh proposition is overruled. It complains that the issue of liability is submitted in several various forms, in that the same question of fact was presented in special issues Nos. 2, 3, 4, 5, 7, and 8. While there is some similarity in the matters inquired about in the several issues, yet they are not wholly the same, and are framed to meet the several different phases of the evidence adduced. We think no error is shown, and that, if so, same is harmless; no injury to appellant being shown.

Appellant's ninth proposition is:

"It is error for the court, after the court's main charge has been submitted and delivered to the jury and after the jury has retired and considered their verdict, to again call the jury before the court to give them an additional written charge without the knowledge or consent of counsel for defendant and without counsel for defendant being present and having an opportunity to review such additional charge and to file their objections and exceptions to the same."

This proposition is based upon appellant's thirty-third assignment of error. It grew out of the following facts:

The case was submitted to the jury on the court's charge on the afternoon of November 8, 1929; after the argument of counsel the jury retired to consider of their verdict at about 4:15 p. m. on said date. After considering their verdict during the remainder of the afternoon and evening of that date, the jury on the morning of November 9, 1929, at about 9:30 a. m. sent the court the following communication in writing:

"The jury want it made plain to them as to the meaning of exemplary and punitory damages. If 'No' should be answered to Questions No. 1 and 2, and 'Yes' to 3, 4 and 5, would this have any effect on the verdict rendered?

"[Signed] W. L. West, Foreman."

The court endeavored to have counsel for both parties present to consider the jury's questions and the answer to be made thereto by the court, but none of appellant's counsel being in the city and not obtainable, the court framed and submitted to the jury the following answer and charge:

"Gentlemen of the Jury: You have inquired of the court with regard to the meaning of exemplary and punitory damages. In the main charge given you the word exemplary and punitory mean the same. The court has endeavored to make the meaning of those terms clear to you in his main charge but without any purpose or intention of expressing an opinion on the issue and with no intention or purpose of comment upon the weight of any evidence introduced I give you

the following definition of, the meaning of 'exemplary' or 'punitory' damages:

"By 'exemplary' or 'punitory' damages is meant any damage which the jury, in its discretion, might award a plaintiff against a defendant in the nature of a penalty assessed against the defendant by reason of the wilful, wanton and wrongful commission of the act which caused the actual damages, if you find that such wilful, wanton and wrongful act was committed and actual damages sustained. But exemplary damages can only be awarded in the event the plaintiff has already suffered actual damages.

"You are to determine from all the facts and circumstances of the case whether or not you will award exemplary or punitory damages, and if so the amount.

"In answer to the other question requested by you I desire to say that it is not within the legal province of the court to suggest to the jury the effect of your finding to any issue submitted. You will answer the issues submitted to you according as you find the facts to be. I suggest that you carefully read the instructions given you again and endeavor to arrive at your verdict in the light of those instructions, with these additional explanations. In arriving at your answers to the issues submitted you will not in any manner take into consideration the effect of such answers to said issues.

"[Signed]

"O. A. Hodges, Judge Presiding."

Appellant's bill of exception to the action of the court in giving the charge above set out was approved by the court with the following qualification:

"The foregoing bill of exception is approved with the following qualification:

"After the case was submitted to the jury and argument of counsel had on the afternoon of November 8. That night counsel for the appellant, Texas & New Orleans Railroad Company, left the City of Lufkin and went to Houston. On the following day, November 9th, as I recall, in the forenoon, the jury sent down to the court by the sheriff a written request that the court give them further instructions, said written request being in the language quoted in the above bill of exceptions and before the court answered said inquiry made of the court by the jury he requested the sheriff to get counsel for both plaintiff and defendant into the courtroom and after a short time the plaintiff's counsel came in court and agreed that the court may give the jury such additional instructions as the court desired in answer to the jury's inquiry and the court having ascertained that Messrs. Arterbury & Coolidge had returned to Houston made further inquiry as to whether or not any local counsel residing in Lufkin represented the defendant, Texas & New Orleans Railroad Company, and after some in-

quiry it was developed that Kester W. Denman; of Mantooth & Denman who the court understood represented the defendant, Texas & New Orleans Railroad Company locally, but who did not appear after the jury was selected in the trial of this case, was out of the city; and after the court was not able to find any attorney in town who represent this defendant, Texas & New Orleans Railroad Company, and the court knowing that the attorneys who tried the case had left the city of Lufkin and could not be had without considerable delay, the court thereupon called the jury before and gave the written instruction which is shown in appellant's Bill of Exceptions No. 2.

"The court had no intention or purpose in depriving the attorneys for the defendant the opportunity to examine the instructions and file their exceptions thereto, but the court deeming it proper to give said instructions to the jury in view of the inquiry made of the court and realizing that to wait until counsel could be notified in the City of Houston and brought back to Lufkin before submitting the instructions to the jury, would occasion an unreasonable delay, and it being no fault of the court that counsel was not in attendance upon court, the court proceeded to give such instruction to the jury.

"[Signed]

"O. A. Hodges, Judge Presiding."

Article 2198, R. S., authorizes the jury after receiving the court's charge and retiring to consider their verdict, to ask for further instructions touching any matter of law, and makes it the duty of the court to give such further instructions in writing. Certainly counsel have the right to know of the proceedings and to object and except to such additional instructions, but if counsel, knowing the law, voluntarily absent themselves from the court, and from the county in which the court is sitting, and thus makes it impossible for the court to have them present for the purpose of considering and answering the jury's request for additional instructions, the law does not contemplate that the court shall, in the face of the statute, refuse to receive or consider the jury's request presented as the law provides, nor to indefinitely hold the jury and their request waiting the return of counsel. The right of counsel to be present is one for their benefit, to be exercised at the convenience of the court and jury, and when counsel's own voluntary act, as here shown, prevents their exercising same, it should be held that such right is waived. At least, we think, the court's action in the premises was one of discretion, and, in the absence of abuse, should not be disturbed. The court's qualification to the bill shows that the court endeavored to have counsel present and that when it was made known to him that they each and all were absent from the court and its vicinity, he acted as the law authorized

and required, and charged the jury in response to its request. We find no fault with the charge thus given. The assignment is overruled. We have examined all the authorities cited by appellant to sustain its contention on this point, but find none of them applicable to the instant facts, nor the rulings therein controlling when applied to the facts.

Appellant presents a number of other propositions, all of which have been considered, and none of which show error and are overruled. From what we have said it follows that the judgment should be affirmed, and it is so ordered.

Affirmed.